## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

TALIA S. NELSON,                          )
                                          )
      Plaintiff,                    )
                                          )
v.                                        )       No. 2:18-CV-63 RLW
                                          )
ANDREW M. SAUL,[1]                        )
Commissioner of Social Security,          )
                                          )
      Defendant.                    )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 1383(c)(3) for judicial review of the Commissioner of

Social Security's final decision denying plaintiff Talia S. Nelson's application for Supplemental

Security Income ("SSI") under Title XVI of the Social Security Act ("the Act"). Because the

Appeals Council denied Plaintiff's Request for Review, the decision by the Administrative Law

Judge ("ALJ") is the final decision of the Commissioner. For the reasons set forth below, the

Court reverses the decision of the Commissioner.

### I. Procedural History

Plaintiff protectively filed an application for SSI on July 29, 2015. In the application, she

alleged disability beginning August 24, 2007. Record ("R.") at 143. Plaintiff's claims were

denied on October 1, 2015. R. 15. Plaintiff timely filed a request for a hearing before an ALJ on

October 26, 2015. Id. On March 20, 2017, plaintiff moved to amend her alleged onset date to

July 29, 2015. R. 159. On March 29, 2017, plaintiff testified at a hearing before the ALJ. R. 6.

In a decision dated October 19, 2017, the ALJ concluded plaintiff was under a disability but also

---

[1]Andrew M. Saul was confirmed as Commissioner of Social Security by the United States Senate
on June 4, 2019 and is ordered substituted as the defendant pursuant to Federal Rule of Civil Procedure
25(d).

concluded that a substance use disorder was a contributing factor material to the determination of disability and determined that plaintiff was not disabled under the Act at any time from the date the application was filed through the date of decision. R. 15-26. On May 25, 2018, the Appeals Council denied plaintiff's request for review. R. 1-3. Accordingly, the Appeals Council found that plaintiff's reasons did not provide a basis for changing the ALJ's decision. R. 1. As a result, the ALJ's decision stands as the final decision of the Commissioner.

## II. Legal Standard

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. The Social Security Act defines disability "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1520. "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities. . . ." Id. "'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments

2

would have no more than a minimal impact on [his or] her ability to work.'" Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001)).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Fourth, the impairment must prevent the claimant from doing past relevant work. 20 C.F.R. §§ 416.920(f), 404.1520(f). The burden rests with the claimant at this fourth step to establish his or her Residual Functional Capacity ("RFC"). Steed v. Astrue, 524 F.3d 872, 874 n.3 (8th Cir. 2008) ("Through step four of this analysis, the claimant has the burden of showing that she is disabled."). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).

Fifth, the severe impairment must prevent the claimant from doing any other work. 20 C.F.R. §§ 416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to show evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. Steed, 524 F.3d at 874 n.3. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the

3

Commissioner at step five."). Even if a court finds there is a preponderance of the evidence against the ALJ's decision, the decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

It is not the district court's role to re-weigh the evidence or review the factual record de novo. Cox, 495 F.3d at 617. Instead, the district court must determine whether the quantity and quality of evidence is such that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function for the ALJ, who is the fact-finder. Masterson v. Barnhart, 363 F.3d 731, 736 (8th Cir. 2004). Thus, an administrative decision that is supported by substantial evidence is not subject to reversal because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022.

To determine whether the Commissioner's final decision is supported by substantial evidence, the court must review the administrative record as a whole and consider:

(1) Findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

4

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

Additional analysis is necessary when an ALJ finds that a claimant is disabled but there is medical evidence of substance abuse or alcoholism in the record. 20 C.F.R. § 416.935(a). Where there is such evidence, the ALJ is required to determine if the substance abuse is a material contributing factor to the claimant's disability, with the "key factor" in the analysis being whether the ALJ "would still find [the claimant] disabled if [she] stopped using drugs or alcohol." 20 C.F.R. § 416.935(b)(1). The ALJ must determine which of the claimant's disabling limitations, physical or mental, would remain if the claimant stopped using substances or alcohol, and then determine whether any or all of the remaining limitations would be disabling. 20 C.F.R. § 416.935(b)(2). If the ALJ finds a claimant's remaining limitations would not be disabling, the substance abuse is a material contributing factor to the claimant's disability and the ALJ must conclude the claimant is not disabled. 42 U.S.C. § 1382c(a)(3)(J); 20 C.F.R. § 416.935(b)(2)(i). In contrast, if the ALJ finds the remaining limitations would be disabling by themselves, the substance abuse is not material and the ALJ must conclude the claimant is disabled. 20 C.F.R. § 416.935(b)(2)(ii).

### III. Administrative Decision

In the decision in this case, the ALJ found at step one that plaintiff had not engaged in substantial gainful activity since July 29, 2015, the application date. R. 18; see 20 C.F.R. § 416.971. At step two, the ALJ found that plaintiff had severe impairments of mental disorders variously diagnosed as a major depressive disorder, a panic disorder, a borderline personality disorder, a post-traumatic stress disorder, and a poly substance abuse disorder. The ALJ found

5

plaintiff's psoriasis was non-severe, and her migraine headaches were not a medically determinable impairment due to a lack of objective evidence. R. 18; see 20 C.F.R. § 416.920(c). At step three, the ALJ determined that plaintiff's impairments including the substance use disorder met the medical criteria of section 12.04, presumptively disabling impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). R.18; see 20 C.F.R. § 416.920(d). The ALJ found that plaintiff had moderate limitation in understanding, remembering, or applying information; moderate limitation in interacting with others; marked limitation in concentrating, persisting, or maintaining pace; and marked limitation in adapting or managing herself. R. 18-19.

Because the ALJ found plaintiff's impairments met one Listing – and thus that plaintiff was disabled – when the effects of substance abuse were considered, he then considered whether plaintiff's substance abuse was a material contributing factor to her disability. See 20 C.F.R. § 416.935(a). To do so, the ALJ re-evaluated plaintiff as if she had stopped using substances. See R. 19-20. At reconsidered step two, the ALJ found that if plaintiff "stopped the substance use, the remaining limitations would cause more than a minimal impact on [plaintiff's] ability to perform basic work activities; therefore [plaintiff] would continue to have a severe impairment or combination of impairments." R. 19. At reconsidered step three, the ALJ found that plaintiff's remaining severe impairments or combination of impairments would not meet or medically equal the impairments in Listings 12.04, 12.06, 12.08, or 12.15. R. 19-20. The ALJ found that if plaintiff stopped substance use, she would have moderate limitation in understanding, remembering, or applying information; moderate limitation in interacting with others; moderate limitation in concentrating, persisting, or maintaining pace; and moderate limitation in adapting or managing herself. The ALJ also noted that no State agency

6

psychological consultant concluded that a mental listing was medically equaled if plaintiff stopped substance use.

The ALJ then assessed plaintiff's residual functional capacity ("RFC") based on all her remaining impairments. R. 20; see 20 C.F.R. §§ 416.920(a)(4)(iv), 416.935(b)(2). The ALJ found that if plaintiff "stopped the substance use" she would have the RFC to perform "a full range of work at all exertional levels" subject to these non-exertional limitations: Plaintiff can never work at unprotected heights or around moving mechanical parts, or operate a motor vehicle; she could only "understand, remember, and carry out simple and routine tasks;" "use judgment to make simple work-related decisions;" and "respond appropriately to supervisors, coworkers, and the public occasionally." R. 20. At reconsidered step four, the ALJ found that plaintiff has no past relevant work, see 20 C.F.R. § 416.965, but found that if plaintiff "stopped the substance use" there would be a significant number of jobs in the national economy she could perform, including dishwasher, housekeeper, and addresser. R. 24-25; see 20 C.F.R. §§ 416.960, 416.966. On that basis, the ALJ found plaintiff's substance abuse was material to the determination of disability and, as a result, plaintiff had not been under a disability as defined in the Social Security Act at any time from July 25, 2015, to October 19, 2017, the date of the decision. R. 25; see 20 C.F.R. § 416.935(b)(2)(i).

## IV. Testimony at the Hearing

A hearing was held before ALJ on March 29, 2017. Plaintiff appeared in person and with counsel. R. 34. Plaintiff was 27 years old at the time of the hearing. Plaintiff's onset of disability date was July 29, 2015. Plaintiff is single and has two children, ages 8 and 5, who live with their father. Plaintiff lives with her grandparents in their house. R. 36. Plaintiff is four feet eleven inches tall, weighs 169 pounds, and had gained weight due to her then-current pregnancy.

R. 37. Plaintiff attended school through the 11th grade and was in special education for all her classes. R. 37-38. Plaintiff took classes at a community college after she dropped out of high school, obtained a GED, and became a certified nursing assistant ("CNA"). R. 38, 45. Plaintiff's employment as a CNA lasted only a few days because she became upset, contemplated suicide, and had a breakdown. R. 38. Before trying CNA work, plaintiff worked as a hostess at a sports bar three days a week for one year while she was a teenager. R. 38-39. As a hostess, plaintiff took people to their tables, seated them, and gave them menus. R. 49.

Plaintiff has been receiving mental health care since the summer of 2015 with Carol Greening. Plaintiff was diagnosed with major depressive disorder and anxiety and has had multiple hospitalizations because of suicide attempts. Plaintiff's first suicide attempt was in August 2014. R. 39. Plaintiff attempted suicide again in October 2014 and April 2015, the latter with a hanging attempt, and was hospitalized after both attempts. R. 40. Plaintiff has also cut herself and used Claritin, ibuprofen, and Tylenol in overdose attempts. Id. Plaintiff cuts herself approximately five times per month, usually on her left hand but sometimes in her chest area or stomach. R. 41. Plaintiff was hospitalized again in December 2016 after she had suicidal thoughts when she found out she was pregnant after a one-night stand. R. 41.

Plaintiff testified she has suicidal thoughts five times per hour, when she thinks of things such as hanging herself or trying to find a gun to shoot herself. R. 42. Plaintiff's brother died of a heroin overdose in January 2017 at age 22. Id. Plaintiff's grandparents, who are retired, have guns in the house but these are hidden from plaintiff. Id. Plaintiff does not see her children unsupervised. (Id.) Plaintiff hears voices telling her to kill herself. R. 42-43. Plaintiff used street drugs once in October 2016. Plaintiff is prescribed Prozac and Vistaril, and previously

was prescribed Trazodone and Gabapentin but was not taking those during her pregnancy. R. 43-44.

Plaintiff testified she has migraine headaches five times each week, that last "about a couple of hours" or until she goes to bed. She takes Tylenol for these. During the migraines Plaintiff is sensitive to light, especially sunlight, and noise. She will often put her sweatshirt over her head and lay down when she has a migraine. R. 44. The migraines cause nausea twice a week. R. 45.

Plaintiff has never had a driver's license. She took the test six times but was never able to pass. R. 45. When plaintiff was taking community college classes for her GED, she had help as someone took her in another room and helped her study and read the questions to her. R. 46.

Plaintiff does not socialize but sees her two children every weekend. R. 46. Two or three times a year, plaintiff does not feel up to seeing her children. Plaintiff tries to see her children because she likes to think they help with her mental state. Id. Plaintiff feels anxious or depressed all day, every day. Id. Plaintiff does not do anything all day except watch TV. R. 46, 47. Plaintiff is not expected to help her grandparents around the house. R. 46-47. Two or three times per week Plaintiff has difficulty sleeping, either being unable to fall asleep or waking at 2:00 or 3:00 a.m. and being unable to return to sleep. R. 47.

Plaintiff often has difficulty concentrating or following a TV show, and some days can't concentrate. R. 47-48. Plaintiff is compliant with her medications but is still anxious and depressed. R. 48.

A vocational expert ("VE"), Deborah A. Determan, M.S., C.R.C., C.D.M.S., C.C.M, also testified at the hearing. The VE classified plaintiff's past work as a hostess in the Dictionary of Occupational Titles ("DOT"). The ALJ asked the VE to assume a hypothetical individual of

9

plaintiff's age, education, and past work experience with the following range of work at any exertional level: no exposure to unprotected heights or moving mechanical parts; no operation of motor vehicles as a job duty; limited to simple routine tasks and simple work-related decisions; and occasional interaction with supervisors, coworkers, and the public. The ALJ testified such a hypothetical individual would be precluded from plaintiff's past work. R. 51.

The ALJ asked if there were other jobs in the national economy such a hypothetical individual could perform. The VE testified there were jobs at different exertional categories and gave these examples: Such a hypothetical individual could work as a sedentary, unskilled addresser, DOT code 209.587-010, of which there are approximately 11,000 jobs in the national economy; as a light, unskilled housekeeper, DOT code 323.687-014, of which there are approximately 100,000 jobs in the national economy; or as a medium, unskilled dishwasher, DOT code 318.687-010, of which there are approximately 160,000 jobs in the national economy. R. 51-52.

The ALJ inquired whether the hypothetical individual could perform the same work at any exertional level if, in addition to normal breaks, they were off task at least 20% of the work day. The VE testified the hypothetical individual could not perform the same work with the additional off-task condition, based on her experience, knowledge, and training in the field of vocational rehabilitation. R. 52.

Plaintiff's counsel asked the VE how often the hypothetical individual would have contact with supervisors or coworkers in the jobs she identified. The VE testified the jobs were all level eight, which would have the lowest level of interaction with supervisors and coworkers. R. 53. Plaintiff's counsel asked whether there would be any occasion to interact on a daily basis at level eight. The VE testified the definition for level eight is taking instructions and attending

10

to work assignment instructions or orders of supervisors. The VE testified the jobs are routine and repetitive but each would have some level of interaction with others, such as a housekeeper getting room numbers for what is to be cleaned. R. 53.

Plaintiff's counsel asked the VE about employers' tolerance for workers who talked back, had outbursts or other improper reactions, or didn't take criticism well. The VE testified there was a continuum in this context; a worker who made a coworker or supervisor feel threatened would not be able to maintain their job, but a worker who was verbally inappropriate but did not show any aggression would probably be a marginal employee, but this behavior would not preclude competitive employment. R. 53-54.

Plaintiff's counsel asked the VE about employers' tolerance for workers who had anxiety that caused them to leave the workplace. The VE testified an employer might allow this twice but then the job would be in jeopardy. Plaintiff's counsel also asked how many days a month the employers would tolerate absenteeism. The VE testified that if a person missed more than one day of work per month it would preclude competitive employment. R. 54.

## V. Relevant Medical Evidence

A review of plaintiff's medical evidence of record regarding her mental impairments reveals the following relevant evidence. Plaintiff's medical history reveals numerous psychiatric admissions, the first admission during her early teens because of cutting self-injury and behavior problems. R. 345. On October 10, 2014, plaintiff was admitted psychiatrically to Blessing Hospital after she made statements in the office of Dr. Salvador Sanchez, M.D. at Blessing Physician Services of suicidal thoughts and plans to overdose, reporting stressors increased just prior to the admission of starting a new job as a CNA and a planned move. R. 250, 252, 272.

11

Dr. Sanchez reported plaintiff was depressed, hopeless, and her psychiatric condition was unstable. R. 273, 395.

Plaintiff had previously been admitted psychiatrically to Blessing Hospital several times and had a history of cutting and suicidal ideation. R. 250. Plaintiff had past diagnoses of depression, anxiety, and borderline personality disorder. Id. Plaintiff admitted to not taking her psychotropic medications since February 2014. Id. These included Ativan, Citalopram Hydrobromide, and Trazodone. R. 272. Plaintiff admitted a history of alcohol and methamphetamine use but denied recent drug or alcohol abuse. R. 250. Plaintiff's drug urine screen was negative. R. 257. On mental status exam on admission, plaintiff was alert, "superficially cooperative," had depressed mood with dysphoric affect, linear thought processes, endorsed suicidal thoughts with plans to overdose, with poor insight and judgment. R. 253. On intake, Plaintiff was assessed as having major depressive disorder, recurrent, severe, without psychotic features, and borderline personality disorder. Her GAF was 35.[2] R. 253. The

---

[2]A GAF score "represents a clinician's judgment of the individual's overall level of functioning" at a given time, using a scale of 1 to 100. Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. 2000) ("DSM-IV"). As relevant here, GAF scores in the following ranges reflect the following psychological symptoms or functional limitations:

•51-60: Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

•41-50: Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

•31-40: Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoid friends, neglects family, and is unable to work, child frequently beats up younger children, is defiant at home, and is failing at school).

•21-30: Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts

treatment plan was for plaintiff to receive individual and group therapies and be restarted on her medication. R. 253. Throughout her hospitalization plaintiff insisted she was suicidal and would harm herself if discharged; she responded affirmatively when asked if she felt the need of an extended care program. R. 250. Plaintiff "verbalized intense suicidality" and she was ordered transported to McFarland Zone Center for continuing care and treatment. Id. Plaintiff was discharged on October 24, 2014 with a GAF of 40. R. 250. On discharge, plaintiff was taking the antidepressant Trazodone and the selective serotonin reuptake inhibitor Citalopram. Id.

Records from a comprehensive psychiatric evaluation during inpatient treatment at McFarland Mental Health Center reflect that plaintiff had eight previous psychiatric hospitalizations and had been prescribed numerous psychiatric medications including Sertraline, Viibryd, Bupropion, Lexapro, Clonazepam, and Abilify. R. 263. Plaintiff reported previous heavy drinking, recent problems with Adderal, past use of marijuana, pills including Percocet and Oxycodone, methamphetamine, and snortable heroin, but no past substance abuse treatment. Id. Plaintiff scored a 24 on the substance abuse audit screen but had a negative drug screen. Id. There were two suicides in her family history. Id. Plaintiff's appearance was somewhat disheveled, she was generally cooperative and made good eye contact but was depressed, her judgment was chronically poor, and she needed a structured setting for safety. R. 264. Plaintiff had joint custody of her children, ages six and three. Id. Plaintiff had longstanding diagnoses of depression, anxiety, and borderline personality disorder, in the context of significant substance abuse. R. 265. Plaintiff was diagnosed with depressive disorder, anxiety disorder, alcohol and

---

grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).

•11-20: Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death, frequently violent, manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute).

amphetamine abuse, and borderline personality disorder. R. 265-66. Her GAF was 25. R. 266. Among the report's recommendations were that plaintiff "will be admitted to Jefferson Hall as per court order." Id. Her prognosis was "guarded, given her personality traits, lack of adherence to treatment and substance use." Id. The discharge plan was for plaintiff to live with her grandparents. R. 268.

Plaintiff saw Dr. Sanchez for a medication evaluation on February 6, 2015. She was on Trazodone and Venlafaxine, reported anxiety, and had a stable psychiatric condition. R. 270-71.

On March 28, 2015, plaintiff was admitted to Blessing Hospital following a suicide attempt after a verbal and then physical argument with her children's father. R. 275. Plaintiff tried to hang herself after cutting herself with the children present in the household. Id. Plaintiff had been prescribed Effexor, 225 mg per day, but had been taking 75 mg per day due to cost and insurance issues. R. 277. Plaintiff drank six beers prior to the admission and used methamphetamine recently. Her urine tested positive for amphetamines. Id.; R. 284. On mental status exam, plaintiff was calm, cooperative, had good eye contact, depressed mood, and normal speech. Her judgment and insight were poor. R. 277. Plaintiff's GAF was 35 to 40. R. 278. During hospitalization, plaintiff attended group therapy and was started on Paxil 20 mg daily, trazodone 200 mg at bedtime, BuSpar 10 mg three times per day for anxiety, and Vistaril 25 mg three times per day as needed for anxiety. R. 275. A report was made to the Division of Children and Family Services and plaintiff was served with an order of protection under which she was not allowed to be close to her children or the children's father.[3] Id. Plaintiff was discharged from Blessing Hospital on April 3, 2015. R. 275. Discharge diagnoses included

---

[3]The restraining order against plaintiff was dismissed on April 15, 2015, and plaintiff's children were then staying with their father. R. 309.

14

major depressive disorder, severe, recurrent, without psychotic features, and borderline personality disorder. Id. Plaintiff's GAF on discharge was greater than 50. Id.

Plaintiff began outpatient treatment at Transitions of Western Illinois, a mental health and crisis intervention center in Quincy, Illinois, on April 1, 2015, and received services until June 23, 2015 when she moved from the area. R. 288. Plaintiff's GAF at the time of both admission and discharge was 40. Id. Plaintiff had impairments in the daily living skill of money management, and impairments in social adjustment of employment, social/interpersonal relationships, family relationship, and communication skills. R. 292, 299. Plaintiff's diagnosis was major depressive disorder, recurring, severe. R. 299. Plaintiff's anxiety resulted in a lack of friendships, difficulty maintaining relationships, a lack of relaxing activities; her depression resulted in social withdrawal, lack of assertiveness, and difficulty getting out of bed in the morning, and post-traumatic stress disorder resulted in difficulty initiating relationships. R. 306.

On August 6, 2015, plaintiff was admitted to the emergency room at Blessing Hospital after the attempted to overdose by taking approximately 120 Tylenol tablets, some Claritin and ibuprofen, and drinking two 40-ounce beers. R. 314. Plaintiff said she "was just not feeling right" and stated this was her fifth suicide attempt. Id. Plaintiff was living with her grandparents. Id. Plaintiff denied illegal drug use and stated she drank alcohol twice per week. Id. Her urine drug screen was negative. R. 322. A behavioral consultation on August 7, 2015, showed plaintiff to be alert, oriented, calm, and cooperative. R. 317. Her speech was decreased in tone, volume, and production, and her mood was depressed and her affect dysphoric. Id. Plaintiff endorsed ongoing suicidal ideas. Id. Her thought process was linear and goal directed. Id. Her insight and judgment were poor and her impulse control was impaired. R. 317.

15

Plaintiff's GAF was 35 and the examining doctor recommended that she be admitted to the inpatient psychiatric unit when she was medically cleared. R. 318.

On August 7, 2015, plaintiff was admitted to Blessing Hospital. R. 239. The intake history noted that plaintiff had an argument with her boyfriend, "She went home. She was drinking. She impulsively overdosed on Tylenol and Motrin, and she was at the same time talking to her boyfriend." Id. It was noted she has a long history of psychiatric disorders with multiple prior psychiatric admissions and significant borderline personality traits. Id. Plaintiff was "still feeling depressed, anxious, hopeless, helpless, worthless, and suicidal, no specific plans." Id. Plaintiff had a serious history of methamphetamine use but "has been clean for about five months. She is drinking." Id. Plaintiff was cooperative, had fairly good eye contact, monotone speech, appropriate language, depressed mood, normal thought processes, with poor insight, judgment, and impulse control. R. 240. Plaintiff's GAF was 35. Plaintiff's Risperdal, Paxil, and BuSpar were discontinued, Vistaril was increased to 50 mg three times per day as needed, and plaintiff was started on Gabapentin 100 mg three times daily and a trial of Celexa 20 mg daily. Id., R. 242. Plaintiff was to receive individual and group therapy with discharge when she became stable. R. 240. Plaintiff was discharged seven days later on August 14, 2015. R. 242. At discharge, plaintiff had "better" mood, denied suicidal ideation, her judgment and insight were fair, and she was alert and oriented times three. Plaintiff was to follow up at the Hannibal Free Clinic ("HFC") for further medication adjustment and counseling. Id.

On September 14, 2015, plaintiff went to the HFC for a mental health screening. R. 341. Plaintiff was taking Celexa, Gabapentin, Hydroxyzine P, and Trazodone, which she reported was "helping" and her moods were stable, but she scored "very high" on the Patient Health Questionnaire (PHQ-9), which indicated severe depression. Id., R. 385. Plaintiff reported

16

frequent feelings of hopelessness, worthlessness, and loneliness, difficulty with memory, concentration, and the ability to make decisions. She reported feelings that she would be better off dead or of hurting herself nearly every day. R. 341. Plaintiff reported past drug use–"all kinds of stuff"–but stated she hadn't used drugs for years. Id., R. 381, 342, 382. Plaintiff stated she had not been in any drug/alcohol/rehab/detox program in the past. R. 342, 382.

Plaintiff visited Clarity Healthcare for a medication refill on September 17, 2015. She reported a long history of mental health problems that began during childhood, and stated she began cutting herself and having suicidal ideation in fifth grade and began counseling and medication at age thirteen. R. 397. Plaintiff reported she had a distant illicit drug use history and stated she quit drinking "a couple months ago," but the provider noted this was inconsistent with Blessing Hospital discharge notes. Plaintiff stated she suffered post-partum depression after the birth of both her children, and that she still feels the urge to cut daily. Id. Plaintiff scored 25 on the PHQ-9, indicating severe depression. Id., R. 398.

On October 21, 2015, plaintiff was seen at Hannibal Free Clinic by Carol Greening, a psychiatric nurse practitioner, for psychiatric evaluation. R. 377.[4] Plaintiff's primary complaint was that she needed help with her depression. Notes indicate plaintiff stated she frequently feels helpless, hopeless, and worthless, is lonely, and has problems with memory, concentration, attention, and making decisions. R. 377. Plaintiff has suicidal thoughts almost daily but no plan. Plaintiff has made multiple suicide attempts and states she does not deal well with stress and gets overwhelmed and can't cope; she has a history of panic attacks. Id. She has a history of cutting since fifth grade. Id. Plaintiff reported occasional alcohol usage but denied any other substance use for two to three years. Id. Plaintiff was then taking Celexa, Gabapentin, Hydroxyzine, and

---

[4]The Court notes that the Hannibal Free Clinic records were out of order in the administrative record. Some of the two-page evaluation records bore different dates but were consecutively paginated in the record, as discussed *infra*.

Trazodone. Id. Plaintiff does not drive because it is "too scary." R. 378. Nurse Greening diagnosed plaintiff with major depressive disorder, moderate; panic disorder; borderline personality disorder; and stimulant use disorder, amphetamine. R. 379. Plaintiff's Celexa was increased to 40 mg daily, the Vistaril, Trazodone, and Gabapentin were continued, and plaintiff was to start therapy with Sean Meyer, Licensed Clinical Social Worker.

On October 29, 2015, plaintiff was seen at Hannibal Free Clinic by Sean Meyer, LCSW, for an initial psychosocial assessment. R. 366. Plaintiff's psychiatric and family history were reviewed. Plaintiff was living with her grandparents, does not do chores or cook, spends time watching television and reading, and does not drive. Id. She noted she feels depressed. Id. Plaintiff's reported stressors were picking up the children from their father's house as "it feels bad, remembering how he was," being around other people in the family because they are successful and she feels intimidated and like a loser, going to the store and being around a lot of other people, feeling like a failure in life and as a mother, and feeling judged. R. 367. Plaintiff stated she has about two drinks a month. A history of drug and alcohol abuse was noted, and her last methamphetamine use was around April 2015. R. 367. Mental status examination found plaintiff's mood/affect flat, her interview behavior closed, passive, vague, evasive, and contradictory, her content of thought sporadic suicidal thoughts and self-critical, and her insight and judgment poor. Plaintiff was diagnosed with post-traumatic stress disorder ("PTSD"), tobacco and alcohol use disorders, and stimulant use disorder, severe, in early remission. R. 367. Plaintiff was assessed with a GAF of 39. R. 386.

On November 12, 2015, plaintiff had a medication evaluation at HFC and reported feeling "almost worse, irritable" and "can't seem to have a good day" after the increase in

18

Celexa. R. 365, 376. The dosage was returned to 20 mg daily. Id. On November 19, 2015 at HFC, records state that plaintiff "seems really depressed, does not feel any better." R. 364.

On December 2, 2015, plaintiff saw Carol Greening at HFC for a medication evaluation. R. 369. Her mood was depressed and she reported feeling more depressed after the increase in Celexa. Plaintiff was discontinued from Celexa and started on Viibryd. Plaintiff had started cutting herself again for the first time since August 2015. Id. Plaintiff's mood was mildly depressed most days, all day long. Id. Plaintiff denied drug or alcohol use, and her motivation was fair. Id. Nurse Greening found plaintiff's depression and panic were improving; her mood was mildly depressed and slightly improved since starting Viibryd, which was ordered increased to 40 mg daily, and plaintiff was to continue therapy because she began cutting herself again. R. 374. Plaintiff's PHQ-9 score was 20, moderate severe depression, and she had thoughts she would be better off dead, or of hurting herself, nearly every day. R. 384.

On January 6, 2016, plaintiff saw Carol Greening at HFC for a medication evaluation. R. 373. Plaintiff reported her mood was "fairly good" but her boyfriend had just broken up with her, she had been cutting more, and she reported "no friends" and little socialization. Id. Plaintiff remained in therapy and had no severe mood swings but had occasional panic attacks. Her anxiety level was mild to moderate most days. Id. Greening noted plaintiff's mood was depressed. Id. Plaintiff's psychiatric condition was stable, her major depressive disorder and panic disorder were improving, but cutting was noted as to plaintiff's borderline personality disorder. R. 370. Plaintiff's GAF was assessed at 50. R. 386.

On February 17, 2016, plaintiff was seen by Carol Greening at HFC for a medication evaluation. R. 371. Greening noted plaintiff's mood was mildly anxious but plaintiff had taken Trazodone which reduced her anxiety. Id. Plaintiff's psychiatric condition was stable and her

19

depression and panic disorder were improving. R. 372. Greening noted plaintiff's stress had increased because her children's father had been arrested the previous weekend for drug possession. Id. Plaintiff was to continue her medication and therapy and coping strategy was discussed. Id.

On April 20, 2016, plaintiff saw Carol Greening at HFC for a medication evaluation. R. 424. Greening noted that plaintiff's major depressive disorder, panic disorder, and stimulant use disorder were improving, and her psychiatric condition was stable. R. 425. Plaintiff reported that therapy was helping her cope more effectively with stressors and mood swings, and that her energy and motivation were good. R. 424. Plaintiff scored 21 on the PHQ-9, however, indicating severe depression. R. 408. On the PHQ-9, plaintiff stated that within the prior two weeks she had little interest or pleasure in doing things, felt down, depressed, or hopeless, felt tired or had little energy, felt bad about herself, and had thought she would be better off dead, or of hurting herself, nearly every day. Id.

On July 13, 2016, plaintiff saw Carol Greening at HFC for a medication evaluation. R. 422. Plaintiff's mood was mildly depressed and her anxiety was "always bad." Id. Plaintiff had good energy and motivation but fears going out in public. Plaintiff denied any drug or alcohol use. Id. Greening found plaintiff's psychiatric condition was stable, her panic disorder was improving, and her substance use disorder was stable. R. 423. Greening reduced plaintiff's Gabapentin and added Rexulti, an atypical antipsychotic medication, to assist with mood stabilization. Id. Plaintiff scored 15 on the PHQ-9, indicating moderate severe depression. R. 406.

On August 3, 2016, plaintiff saw Carol Greening for a medication evaluation. R. 419. Plaintiff reported her mood was fairly stable with the switch from Gabapentin to Rexulti, but her

20

brother had attempted to commit suicide over the weekend and she was experiencing mild depression and anxiety about him, but no panic attacks. Plaintiff reported alcohol use in the prior week but denied any substance use. Id. Greening evaluated plaintiff's mood as mildly depressed, id., and fairly stable, R. 420, her psychiatric condition as stable, and her major depressive disorder, panic disorder, and substance use disorder as improving. R. 420.

On September 7, 2016, plaintiff saw Carol Greening for a medication evaluation. R. 417. Plaintiff reported her mood was fairly stable. The narrative of the treatment note includes: "Study to get driver's permit been considering school." Id. Plaintiff still gets anxious around a lot of people but had no recent panic attacks. Id. Plaintiff's energy and motivation were adequate and she denied any drug usage but admitted social alcohol use. Id. Greening evaluated plaintiff's psychiatric condition as stable, her major depressive disorder and panic attack disorder as improving, and her substance use disorder as stable. R. 418.

On October 19, 2016, plaintiff saw Carol Greening for a medication evaluation. R. 426. Plaintiff reported her mood was fairly good but she scored 15 on the PHQ-9, moderate severe depression. R. 406. Plaintiff felt down, depressed, or hopeless, and had trouble concentrating on things such as reading or watching television, more than half the days. Id. Plaintiff reported feeling down but not suicidal, with mild anxiety and rare panic attacks. Plaintiff denied drug usage and stated she had been going out more often with a friend. R. 426. Plaintiff expressed concern over the cost of the Vistaril she was taking. Id. Greening found plaintiff's psychiatric condition was stable, and her major depressive disorder, panic disorder, and stimulant use disorder were all improving. R. 427.

On November 18, 2016, plaintiff took a pregnancy test and the results were positive. R. 411. Plaintiff had an initial prenatal visit at the Hannibal Clinic on November 29, 2016. R. 474.

Plaintiff stated she was trying to decrease her antidepressants by slowly decreasing the dose. R. 475. She denied any drug or alcohol use. R. 434. Plaintiff was taking Viibryd, Trazodone, Prozac, and Vistaril, but stopped taking Viibryd and Trazodone in December 2016 because of the pregnancy. R. 431. She also stopped smoking. Id.

On December 4, 2016, plaintiff went to the Hannibal Regional Hospital ("HRH") emergency room stating that she was going to hang herself because she was pregnant and did not want the baby. R. 436. Plaintiff was not currently taking her depression and anxiety medications because of the pregnancy. Id. Plaintiff's drug screen was negative. R. 440, 459. Plaintiff was kept overnight, her psychiatric condition was stabilized, and she was transferred to SSM St. Mary's Hospital in Jefferson City ("St. Mary's") by EMS because specialty psychiatric care was unavailable at HRH. R. 442, 446, 452, 454.

Plaintiff was admitted to St. Mary's on December 7, 2016. R. 464. Mental status exam revealed plaintiff was attempting to be cooperative and appeared fairly reliable. R. 468. Plaintiff showed depressed mood with somewhat hopeless affect, mild episodic anxiety was noted during the interview, and positive suicidal ideation with plan. R. 468. Plaintiff reported rare use of alcohol, past use of cannabis, "pills," methamphetamine, and heroin. Id. Plaintiff reported last use of illicit drugs "last summer [2016] several months ago." Id. Plaintiff had decreased production of speech and mildly increased latency time with questions. R. 469. She was oriented times three, her intelligence was mildly below average, her insight was marginal, and her judgment impaired. Id. Diagnoses were major depressive disorder, recurrent; borderline personality disorder; history of cannabis use disorder. Id. Plaintiff was started on Prozac 20 mg daily and Vistaril 25-50 mg, four times daily as needed, with a treatment plan of supportive therapy, ward activity, groups, and activities of daily living. Id.

22

Plaintiff was discharged from St. Mary's on December 14, 2016. R. 464. She had a "somewhat longer admission" and showed very slow improvement. R. 465. Plaintiff was initially quite withdrawn, isolative, and tearful. She later came out of her room, attended groups, and interacted with peers. Id. She tolerated the medications and her anxiety appeared to improve. Id. At discharge her mood was stable, with brighter affect, no suicidal ideation, upbeat and positive, future and goal oriented. Id.

On December 21, 2016, plaintiff saw Carol Greening at Hannibal Free Clinic for a medication evaluation. R. 489. Plaintiff was mildly depressed and had mild anxiety but did not report any further suicidal ideation. Id. Plaintiff's psychiatric condition was stable and her mood was stabilizing. R. 288. Greening noted that plaintiff had Medicaid coverage now. Id.

On January 18, 2017, plaintiff saw Carol Greening at Hannibal Free Clinic for a medication evaluation. R. 487. Plaintiff was coping fairly well with limited support. Id. The baby's father was not involved. She had occasional thoughts of suicide but no plans or attempts. Id. Plaintiff denied any drug or alcohol use. Id. They discussed coping strategies and plaintiff's medication efficacy was fair. Id. Plaintiff's mood was depressed. Id. Plaintiff's major depressive disorder and panic disorder were improving, R. 490, but Greening increased plaintiff's dosage of Prozac to 40 mg per day because of increasing symptoms of depression. Id., R. 505.

On February 3, 2017, plaintiff was seen at Clarity Healthcare for individual psychotherapy.[5] R. 502. Plaintiff's brother had recently died of a heroin overdose. Plaintiff had been crying a lot, felt down, and had gone a couple of days without showering or brushing her teeth. Id. The therapist assessed plaintiff for safety and practiced challenging self-critical

---

[5]It appears plaintiff saw Sean Meyer, LCSW, for psychotherapy at Clarity during this time period although the relevant records are unsigned. Carol Greening stated in a medication evaluation record that plaintiff was "[s]eeing Sean every 1-2 weeks for support." R. 517.

23

thoughts and strengthening realistic and compassionate thoughts. R. 503. Plaintiff agreed she tends to use suicidal thoughts as a default for escape from painful or overwhelming emotions or difficult situations, but said, "It's hard to change." Id. The diagnosis was generalized anxiety disorder, chronic, severe. Id. Plaintiff's self-care plan was to cherish memories of her brother, talk to supports, pet the cat, watch funny movies with her grandma, eat, go to a friend's house. R. 504. Plaintiff did not feel at risk of self-harm at the time, knew to go to the ER if she was at risk of harm, and had access to a crisis line on her phone. Id.

On February 8, 2017, plaintiff saw Carol Greening at Clarity for medication management without psychotherapy. R. 505. Plaintiff reported it was difficult to determine her response to the increased dosage of Prozac because she had been experiencing daily thoughts of wanting to die after her brother's death. Id. Plaintiff was four months pregnant at the time, denied any use of drugs or alcohol, reported her anxiety as mild most days, and had occasional panic attacks. Id. Plaintiff's mood was depressed, her insight and judgment were within normal limits, and she denied any suicidal ideation. R. 506. Plaintiff was assessed as having severe major depressive disorder, moderate symptomatic panic disorder, moderate amphetamine-type substance disorder, asymptomatic (in full sustained remission), and mild borderline personality disorder. R. 507. The plan stated plaintiff's mood was moderately depressed with occasional suicidal ideation. R. 508.

On February 10, 2017, plaintiff was seen at Clarity for individual psychotherapy. R. 510. Plaintiff continued to have periodic thoughts of self-harm with no intent or plan and was understanding this is an addictive habit. Id. Plaintiff enjoyed her children on weekends and was talking with her father, who was being supportive. Plaintiff's mood was "more animated, within context. Overall continues to experience grief reaction." Id. The therapist worked on emotional

24

identification and management, applied grief work, applied cognitive behavioral therapy, reviewed self-care skills, practiced assertiveness with parents, anticipated and practiced tools to use with her father and his girlfriend, and surrounding the funeral. R. 511.

On February 17, 2017, plaintiff was seen at Clarity for individual psychotherapy. R. 513. Plaintiff reported talking with her father at length, feeling closer to him, and also reported intense sadness at the death of her brother. Id. Plaintiff stated, "It should have been me not him," and was having thoughts of suicide when her feelings got intense. Id. Plaintiff had no intent or plan, was talking with her best friend or grandma, and looked forward to seeing her children on weekends. She was planning to attend her brother's funeral with her father. Id. Plaintiff expressed negative thoughts that she couldn't do anything right, and that the family is embarrassed about her. R. 514. The therapist reinforced plaintiff's relationships with those she had mutually caring relations with and continued to work to reduce and transform negative thinking habits. Id. Plaintiff appeared to be at low risk of self-harm due to current high stress of brother's death, unplanned pregnancy, and lack of income/dependence. R. 514.

On March 1, 2017, plaintiff saw Carol Greening at Clarity for medication management without psychotherapy. R. 517. Plaintiff's mood was variable. She stated that during the week she stays in the house most of the time but is out more on the weekend when she has the children. Id. Plaintiff had occasional thoughts of wanting to die but no plans. Plaintiff remained in therapy, her energy and motivation were fair, her anxiety was mild, and she had no recent panic attacks. She denied any drug usage. Id. Plaintiff had difficulty concentrating, was feeling down, depressed or hopeless nearly every day, had feelings of guilt, little interest or pleasure in doing things nearly every day, and suicidal ideation. R. 518. Plaintiff's safety management plan

was to seek daily support from grandparents, her friend, the kids on weekends, and to call the crisis line or go to the ER if at risk. R. 519.

On March 3, 2017, plaintiff was seen at Clarity for individual psychotherapy. R. 523. Plaintiff continued to ruminate about her brother's death and had no communication from her father for the past two weeks. She did not know if a memorial for her brother in Chicago had taken place and was "afraid" to call her father as "it brings me down more." Id. Plaintiff has "no plans for next steps in her life, no effort." Plaintiff's mood was angry. Id. Plaintiff reported occasional cravings for heroin, which she abused several years ago when with the father of her older children, but no plan to use. Id. Plaintiff admitted using methamphetamines until "last August" (2016) and "weed" until October (2016), but stated she was sober the past four months.[6] Id.

Plaintiff reported concerns about her children due to neglect and unsanitary conditions in her ex-boyfriend's home, and the visit focused on options to get help for them. R. 524. The clinician encouraged plaintiff to seek sobriety resources due to the risk of relapse once the baby was born. Id. An Individualized Action Plan was created with goals: that plaintiff focus on living and challenge thoughts of not wanting to live, R. 524, face her fears and take healthy risks, R. 525, focus on what makes sense to her and not worry about what uncaring people think, sobriety and support to maintain it, and kids' safety and care. Id. Among other things, plaintiff was to call Turning Point for an assessment and find local Alcoholics Anonymous or Narcotics Anonymous groups and start going. Id. Plaintiff's diagnoses were major depressive disorder, recurrent severe without psychotic features, severe; asymptomatic amphetamine-type disorder, moderate (in full sustained remission); cannabis dependence, in remission, severe; and opioid dependence, in remission, severe. R. 526.

_____

6

On March 17, 2017, plaintiff was seen at Clarity for individual psychotherapy. R. 529. Progress notes state plaintiff felt more positive about the baby, felt support from others, and thoughts of her brother were present but less ruminative. Id. Plaintiff still worried about what others think and had negative thoughts but was more aware when this was happening and seeing options. Plaintiff was "playing with the cat, watching and listening to comedic or pleasant content, avoiding scary or violent images." Id. The situation with her children was being monitored by extended family. Id. The history of plaintiff's relationship with her father was addressed and she shared new information about it. R. 530. Plaintiff's diagnoses from this visit now included post-traumatic stress disorder. R. 532.

## VI. Expert Medical Opinions

### A. Thomas J. Spencer, Psy.D.

On September 23, 2015, reviewing consultant Thomas J. Spencer, Psy.D., completed an in-person psychological evaluation of plaintiff. R. 344. Plaintiff admitted a history of alcohol and drugs including marijuana, methamphetamine, "pills" including Adderall, and huffing, but denied use in almost a year. R. 345, 346. Plaintiff claimed her last intoxication was a month prior. R. 346. Plaintiff's two children lived with their father at the time and plaintiff had lived with her maternal grandparents since December 2014. R. 345. Plaintiff's activities of daily functioning were to read and watch TV during the week but little else. R. 346. She isolated to her bedroom and had limited meals with her grandparents. When her children were with her on weekends, they would watch a movie together or she would watch them play. Plaintiff has poor compliance with activities of daily living, and the grandparents do not expect her to help around the house. Id. Dr. Spencer noted plaintiff had a restricted affect, questionable insight and judgment, fair eye contact, and soft speech. She had no impairment of grooming or hygiene. R.

346. Dr. Spencer diagnosed plaintiff with bipolar disorder, alcohol abuse, polysubstance abuse by history, and borderline personality disorder. R. 347. He also assessed plaintiff with a GAF score of 50-55. Id. He noted plaintiff had only two employers: She worked as a Certified Nursing Assistance in October 2014 for three days but stated she did not return for the fourth shift because "I just couldn't handle it;" and worked for a year as a restaurant hostess while in her teens but had difficulty getting along with the employer and stopped showing up. R. 347. Dr. Spencer concluded plaintiff appeared capable of understanding and remembering simple instructions, and of engaging in and persisting with simple tasks. Id. Dr. Spencer found plaintiff demonstrated moderate to marked impairment in her ability to interact socially and moderate to marked impairment in her ability to adapt to the environment, and she did not appear capable of managing her benefits without assistance. R. 347.

B.   Barbara Markway, Ph.D.

On October 1, 2015, Barbara Markway, Ph.D., state agency reviewing psychologist, prepared a report based on her review of plaintiff's psychiatric history consisting of records from Blessing Behavioral Center, Comprehensive Health Systems, Hannibal Free Clinic, Blessing Hospital, McFarland Psychiatric Hospital, Transitions of Western Illinois; and third-party function reports, plaintiff's work history, and plaintiff's disability report. R. 61-64.

Dr. Markway found plaintiff had medically determinable impairments of severe affective disorders; severe substance addiction disorders; severe drugs substance addiction disorders; and severe personality disorders. R. 65. She concluded plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social function, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. R. 65.

Dr. Markway found plaintiff was moderately limited in the ability to understand and remember detailed instructions and to carry out detailed instructions, R. 68; moderately limited in the ability to maintain attention and concentration for extended periods, R. 69; moderately limited in the ability to work in coordination with or in proximity to others without being distracted by them, id.; moderately limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods; id.; moderately limited in the ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors, id.; and moderately limited in the ability to respond appropriately to changes in the work setting, and to set realistic goals or make plans independently of others. R. 69-70.

Dr. Markway concluded plaintiff retained the ability to understand and remember simple instructions and to carry out simple work instructions. R. 70. Plaintiff could maintain adequate attendance and sustain an ordinary routine without special supervision. Id. Plaintiff could interact adequately with peers and supervisors in a work setting where social interaction is not a primary job requirement. Id. Plaintiff could adapt to minor changes in a work setting. Id. Plaintiff was limited to unskilled work because of her impairments. R. 71. Dr. Markway stated that substance abuse was documented in the record, but a materiality determination was not required. R. 71.

C.  Carol Greening, A.P.R.N.

On August 10, 2016, Carol Greening, plaintiff's primary treating mental health provider and a psychiatric nurse practitioner licensed by the State of Missouri, prepared a Medical Source Statement of Ability to Do Work-Related Activities. R. 389. Greening stated that plaintiff has

29

mild limitations in her ability to understand and remember simple instructions, to carry out simple instructions, and to make judgments on simple work-related decisions. Id. Plaintiff has marked limitations in her ability to understand and remember complex instructions, to carry out complex instructions, and to make judgments on complex work-related decisions. Id. Greening supported these limitations by stating plaintiff "has problems with anxiety & panic. When in situation[s] where there are high demands becomes overwhelmed & unable to focus & concentrat[e]. Usually has to leave the situation." Id.

Greening stated that plaintiff has moderate impairment in her ability to interact appropriately with the public but marked impairment in her ability to interact appropriately with supervisors and co-workers, and to respond appropriately to usual work situations and changes in a routine work setting. R. 390. Greening supported these limitations by stating that "any high stress situation results in severe panic attack–unable to work does not tolerate places where she is unable to leave when anxiety is high." Id. Greening also stated that plaintiff has mood issues (depression), low energy and motivation, has difficulty concentrating, and anxiety causes her to avoid being around others. Id. Greening noted plaintiff's several recent medication adjustments, her poor coping skills, and that she has more bad days than good days. Id.

Greening anticipated plaintiff's impairments would cause her to be absent from work more than four days per month and her symptoms would likely be severe enough to interfere with attention and concentration needed to perform even simple work tasks twenty-five percent or more of the time. Id. Greening stated plaintiff would need to take unscheduled breaks during a work day on a daily basis as a result of panic attacks, anxiety, crying spells, and adverse effects of medication. R. 391. Greening also stated that plaintiff's alcohol and/or substance abuse do not contribute to any of her limitations. Id.

## VII. Discussion

Plaintiff asserts there is not substantial evidence to support the Commissioner's decision. In her brief in support of the Complaint, plaintiff raises two arguments. First, she asserts the ALJ erred by failing to apply controlling weight to the opinion of treating psychiatric nurse practitioner Carol Greening, who opined that plaintiff would have a marked impairment in the ability to interact appropriate with supervisors and coworkers, and a marked impairment in the ability to respond appropriately to work situations and changes in a route work setting; high stress situations result in plaintiff having a severe panic attack and being unable to work, and plaintiff would miss more than four days of work per month, be off task twenty-five percent or more of the time, and need unscheduled breaks daily due to panic attacks, crying spells, anxiety, and adverse effects of medication. R. 390-91. Second, Plaintiff argues the ALJ erred in failing to give proper weight to the opinion of consultative examining physician Thomas J. Spencer, Psy.D., who found plaintiff "demonstrated moderate to marked impairment in her ability to interact socially (i.e. supervisors, co-workers, and public) and to adapt to the environment," and that plaintiff did not appear capable of managing her benefits without assistance.

Defendant responds that the ALJ properly weighed the opinion of plaintiff's nurse practitioner, who cannot be a "treating physician" and is not considered an "acceptable medical source" under agency regulations. Defendant states that only opinions from acceptable medical sources may be afforded controlling weight. Defendant also responds that the ALJ properly weighed the opinion of the consultative examining physician. Further, Defendant argues substantial evidence supports the ALJ's RFC determination and that the ALJ properly found plaintiff could perform other work.

31

The key question is whether the ALJ properly weighed the opinion evidence, and thus whether he supported with substantial evidence his conclusion that plaintiff's substance and alcohol use is a contributing factor material to the determination of disability. Although the ALJ properly considered plaintiff's substance and alcohol use, he cited no medical evidence from which it can be reasonably inferred that in the absence of plaintiff's substance and alcohol use her severe impairments are no longer disabling, and he failed to give adequate weight to the opinion of Carol Greening. The Court therefore reverses and remands so the ALJ may revisit the substance and alcohol abuse analysis, further develop the record, which may include supplemental medical examinations and consultation with a medical expert, and prepare a new RFC determination including a reevaluation of how much plaintiff would be off task during the work day.

A. Evidence Required for Determination of Substance Abuse Materiality

As stated above, an individual "shall not be considered to be disabled" if drug abuse or alcoholism ("DAA") is a material contributing factor to the disability. 42 U.S.C. § 1382c(a)(3)(J); 20 C.F.R. § 416.935(a). The Social Security Administration has issued policy interpretation rulings, most recently SSR 13-2p, 2013 WL 621536, that establish the process for an ALJ to follow in conducting a DAA materiality inquiry. The process requires that when a claimant has at least one other medically determinable impairment that could be disabling by itself, the ALJ must determine whether the other impairment might improve to the point of nondisability if the claimant were to stop using drugs or alcohol. SSR 13-2p, 2013 WL 621536, at *7. This step requires the ALJ to "project the severity of the claimant's other impairment(s) in the absence of DAA." Id.

When there are co-occurring mental disorders, such as plaintiff's multiple disorders here, the SSA has stated it knows of no research data usable to "predict reliably that any given claimant's co-occurring mental disorder would improve, or the extent to which it would improve, if the claimant were to stop using drugs or alcohol." Id. at *9. Accordingly, to make a finding that DAA is material in such a case, the ALJ "must have evidence in the case record that establishes that a claimant with a co-occurring mental disorder(s) would not be disabled in the absence of DAA." Id. Unlike cases involving physical impairments, the ALJ is not permitted to "rely exclusively on medical expertise and the nature of a claimant's mental disorder" to support a finding that DAA is material. Id.

If "the record is fully developed and the evidence does not establish that the claimant's co-occurring mental disorder(s) would improve to the point of nondisability in the absence of DAA," the claim will be allowed. Id. In addition, in considering periods of abstinence, "[i]f the evidence in the case record does not demonstrate the separate effects of the treatment for DAA and for the co-occurring mental disorder(s)," the SSA "will find that DAA is not material." Id. at *12. Consequently, an ALJ must be particularly careful when evaluating evidence demonstrating that a claimant's co-occurring mental disorder(s) improved when she received mental health and/or substance abuse treatment in "a highly structured treatment setting," such as a hospital or residential rehabilitation center. See id. at *12-13; see McGoffin v. Barnhart, 288 F.3d 1248, 1253 (10th Cir. 2002).

Of course, the burden of proving that substance abuse was not a contributing factor material to the disability determination falls on the claimant. Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (cited case omitted). Nonetheless, the ALJ retains the responsibility to develop a full and fair record in the non-adversarial proceeding. Hildebrand v. Barnhart, 302

F.3d 836, 838 (8th Cir. 2002). In some cases, this duty requires the ALJ to obtain additional medical evidence before rendering a decision. See 20 C.F.R. § 404.1519a(b); Medley v. Berryhill, 2019 WL 1115527, at *7 (E.D. Mo. Mar. 11, 2019). "The ALJ's duty to develop the record extends even to cases where an attorney represented the claimant at the administrative hearing." Id. (citing Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004)). "The ALJ possesses no interest in denying benefits and must act neutrally in developing the record." Snead, 360 F.3d at 838. "The Commissioner and the claimant's attorney both share the goal of ensuring that deserving claimants who apply for benefits receive justice." Medley, 2019 WL 1115527, at *7 (citing Battles v. Shalala, 36 F.3d 43, 44 (8th Cir. 1994)).

The Eighth Circuit has described the appropriate analysis to reach the key issue in cases involving claimants with co-occurring mental disorders and substance use disorders as follows:

> If the gross total of a claimant's limitations, including the effects of substance use disorders, suffices to show disability, then the ALJ must next consider which limitations would remain when the effects of the substance use disorders are absent. Pettit v. Apfel, 218 F.3d 901, 903 (8th Cir. 2000); 20 C.F.R. § 404.1535(b)(2). We have previously noted that when the claimant is actively abusing alcohol or drugs, this determination will necessarily be hypothetical and therefore more difficult than the same task when the claimant has stopped. Pettit, 218 F.3d at 903. Even though the task is difficult, the ALJ must develop a full and fair record *and support his conclusion with substantial evidence on this point just as he would on any other*.

Brueggemann v. Barnhart, 348 F.3d 689, 694–95 (8th Cir. 2003) (emphasis added). Thus, in most cases an ALJ must identify at least some medical evidence supporting the conclusion that a claimant would no longer be disabled if he or she stopped using drugs or alcohol. See Fox v. Colvin, 2016 WL 728271, at *9 (E.D. Mo. Feb. 24, 2016) (remanding in absence of evidence an

34

acceptable medical source had considered the extent to which claimant's mental impairments would remain when the effects of substance abuse were absent).[7]

This correlates to the rule applicable in many Social Security contexts that an ALJ may not rely on his or her lay opinions to the detriment of duly qualified medical professionals. See, e.g., Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (applying same standard in context of RFC determination, i.e., an ALJ must "consider at least some supporting evidence from a [medical] professional" in rendering his or her RFC determination ) (citations and internal quotations omitted); Frankl v. Shalala, 47 F.3d 935, 938 (8th Cir. 1994) (same). Moreover, in cases where the claimant's non-drug or alcohol-related limitations arise from mental impairments, the need to rely on medical evidence as opposed to the ALJ's lay opinion appears even greater. Cf. Morales v. Apfel, 225 F.3d 310, 319 (3d Cir. 2000) ("The principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving . . . mental disability.").

## B. The ALJ's Decision

It is apparent from the text of the ALJ's decision that he followed the Regulations and procedure to the extent the ALJ first considered whether plaintiff was disabled in view of all of her limitations, including her substance and alcohol abuse, prior to considering whether her limitations would remain if her substance and alcohol abuse ceased. Upon doing so the ALJ considered only plaintiff's symptoms, not the causes of her symptoms, and concluded that plaintiff's substance and alcohol abuse disorders were a contributing factor material to the

_____

[7]Another district court has noted, "In a typical case, it would seem most appropriate to require medical evidence directly addressing the issue, in the form of physician opinion(s) regarding the impact of a hypothetical or actual cessation on the claimant's impairments. It is not beyond comprehension, though, that in some cases the medical evidence, alone or in conjunction with non-medical evidence, may so clearly show a marked improvement in the claimant's condition during a period of abstinence that, even absent express medical opinion(s), a finding of non-disability is supportable." Sklenar v. Barnhart, 195 F.Supp.2d 696, 701 n.4 (W.D. Pa. 2002).

35

disability determination and that she was unable to engage in substantial gainful activity. As required by the Regulations, the ALJ then considered whether plaintiff's limitations would remain when the effects of her substance and alcohol use disorders were absent.

The ALJ identified medical records and reports purportedly supporting his conclusion that plaintiff's mental impairments would not be disabling in the absence of substance and alcohol abuse. The Court concludes, however, that none of the records identified by the ALJ sufficiently address whether plaintiff would remain disabled if she quit substance and alcohol abuse for two primary reasons, as discussed below. First, the ALJ based his materiality decision largely on his own interpretation of medical records and treatment notes containing observations of plaintiff's functioning. The evidence cited by the ALJ does not indicate the degree to which plaintiff's symptoms were affected by substance and alcohol use, however, and does not imply that in the absence of substance and alcohol abuse plaintiff would not be disabled.

When there are co-occurring mental disorders in addition to a claimant's DAA, as here, SSR 13-2p makes clear that the ALJ must be able to separate the effects of the two types of impairments in order to find DAA material. "[T]he ALJ must take on the difficult task of untangling the warp threads of the claimant's substance abuse from the woof threads of the claimant's other impairments in order to examine the hypothetical cloth that remains." Malone v. Colvin, 2014 WL 348590, at *3 (W.D. Ark. Jan. 31, 2014); see also SSR 13-2p, 2013 WL 621536, at *9, 12. Here, the evidence relied upon by the ALJ does not adequately separate the effects of plaintiff's substance and alcohol abuse from the effects of her co-occurring mental disorders of major depressive disorder, panic disorder, borderline personality disorder, and anxiety. As such, it does not rise to the level of substantial support for the ALJ's decision.

Second, the ALJ based his conclusion on medical opinions and records he identified as evidence of improvement in plaintiff's condition when she stops using substances and alcohol. The ALJ's selective review of the records for positive information and omission of negative information does not constitute substantive evidence to support his conclusion. Further, the ALJ's reliance on these opinions and records is completely undercut by plaintiff's admission of methamphetamine use until August 2016 and marijuana use until October 2016, R. 523, along with her hearing testimony that she used "street drugs" once in October 2016, R. 43. Consequently, the records do not constitute evidence that plaintiff would not be disabled in the absence of substance and alcohol use.

The ALJ also relied in part on opinion evidence. As discussed below, none of the medical source opinions in this case expressly or implicitly considered what plaintiff's mental impairments would be if she stopped substance and alcohol abuse. Neither the State agency reviewing psychologist nor the consultative psychological examiner attempted to separate the impacts of plaintiff's substance and alcohol abuse from the impacts of her co-occurring severe mental impairments. Further, although "other medical source" and treating mental health provider Nurse Greening stated that plaintiff's limitations were not affected by her substance or alcohol use, this opinion appears to have been based on plaintiff's false representations she was not using drugs and used alcohol only socially. Thus, taking the medical opinions as a whole, none can be read as stating an opinion as to whether plaintiff would still be disabled if she quit substance and alcohol use.

The ALJ made the critical finding that if plaintiff were to cease her substance and alcohol abuse, her remaining mental impairments and limitations would not be severe enough to preclude work activity. R. 20-24. In doing so, the ALJ made an improper medical conclusion based on

his lay opinion of the evidence that plaintiff's substance and alcohol use, as opposed to her co-occurring mental impairments, caused her to have marked limitations in concentration, persisting, or maintaining pace, and in adapting or managing herself, which would abate in the absence of substance and alcohol use. The Court finds the ALJ erred in assessing the RFC and reviewing the medical and other evidence during the DAA analysis by failing to support with substantial evidence the conclusion that if plaintiff stopped substance and alcohol use, she would be able to work.

### 1. Dr. Markway's Opinion

The ALJ gave partial weight to the opinion of State agency reviewing psychologist Dr. Markway, who did not examine plaintiff but reviewed the medical evidence of record as of October 1, 2015.[8] Dr. Markway concluded plaintiff had severe affective, personality, and substance addiction disorders, with moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. R. 65. Dr. Markway stated the medical record contained a history of multiple psychiatric admissions involving drug and alcohol use and "many instances of questionable and contradictory statements regarding drug and alcohol use[.]" R. 66. Dr. Markway opined plaintiff was not disabled and stated that while "[s]ubstance abuse is documented, . . . a DAA material determination is not required." R. 71.

The ALJ stated in the Decision, "I note that no State agency psychological consultant concluded that a mental listing is medically equaled if the claimant stopped the substance abuse." R. 20. This provides no evidentiary support for the Decision because the State agency psychological consultant did not address the issue of plaintiff's mental impairments separate

---

[8]The Court notes that Dr. Markway did not have access to a substantial portion of the medical evidence in the case, consisting of records made after the date of her assessment. See McCoy v. Astrue, 648 F.3d 605, 616 (8th Cir. 2011) (opinion of non-examining medical consultant afforded less weight when consultant did not have access to relevant medical records, including records made after date of assessment).

from her substance abuse impairments. The ALJ mischaracterized Dr. Markway's opinion to the extent he stated that she opined plaintiff "retains the ability to understand, remember, carry out simple instructions, and interact adequately with peers and supervisors in a work setting where social interaction is not a primary job requirement and can adapt to minor changes in a work setting *when not abusing drugs or alcohol.*" R. 22-23 (emphasis added). Dr. Markway's Mental Residual Functional Capacity Assessment did not include the qualifier "when not abusing drugs or alcohol," and plaintiff was abusing drugs and alcohol during the time period covered by all of the medical evidence of record reviewed by Dr. Markway. R. 68-70.

Dr. Markway's opinion and findings say nothing regarding the state of plaintiff's impairments if or when she stopped using drugs or alcohol. Nor did Dr. Markway indicate that her assessments were based on plaintiff's impairments during a phase of abstinence. This opinion therefore does not purport to evaluate plaintiff's impairments in the absence of drug or alcohol consumption and cannot be considered substantive evidence to support the ALJ's Decision.

### 2. Thomas Spencer, Psy.D.'s Opinion

The ALJ gave partial weight to the opinion of consultative psychological examiner Thomas Spencer, Psy.D., who examined plaintiff once on September 23, 2015.[9] During the exam plaintiff admitted a history of drug and alcohol use but denied use in almost a year. R. 345. Dr. Spencer diagnosed plaintiff with bipolar disorder; alcohol abuse by recent history; polysubstance abuse by history; and borderline personality disorder. R. 347. He concluded plaintiff appeared capable of understanding and remembering simple instructions and capable of engaging in and persisting with simple tasks. Id. Dr. Spencer opined plaintiff had moderate to

---

[9]Dr. Spencer also did not have access to a substantial portion of the medical evidence in the case, consisting of records made after the date of his interview of plaintiff.

39

marked impairment in her ability to interact socially and to adapt to the environment and assigned a GAF score of 50-55. Dr. Spencer also opined she did not appear capable of managing her benefits without assistance but did not explain the basis for this opinion. Id.

The ALJ rejected Dr. Spencer's opinion that plaintiff was markedly impaired in social interaction on the basis that she "is assessed as cooperative despite reporting anxiety around crowds and maintains relationships with friends and family." The ALJ's decision to discount Dr. Spencer's opinion that plaintiff was markedly impaired in social interaction is not supported by substantial evidence. Plaintiff's ability to be cooperative in a one-on-one interview offers no insight or substantial evidence as to whether she has social anxiety in a crowd situation. The ALJ ignores substantial evidence that plaintiff cannot leave her house alone because of social anxiety. R. 199. Further, the ALJ's statement that plaintiff maintains relationships with friends and family is a blanket generalization that ignores significant contrary evidence in the record. Although plaintiff has a supportive relationship with her grandparents, has had boyfriends,[10] and in 2016-17 reported having one best friend, the ALJ's statement does not recognize the substantial evidence in the record where plaintiff reports having no friends; no relationship with her mother; no relationship with her father for most of her life, a tenuous relationship with the father after the overdose death of her brother, and then the father apparently dropped out of plaintiff's life again; poor relationships with other family members based on plaintiff's feelings of judgment, shame, and lack of support from them; and a volatile relationship with the father of her two older children which is characterized by physical and emotional abuse in addition to drug and alcohol abuse.

This being said, because Dr. Spencer's opinion was written while plaintiff was still actively abusing drugs and alcohol, it offers no substantive evidence that adequately separates

---

[10]The record indicates plaintiff met one of her boyfriends in the "psych ward." R. 373.

40

the effects of plaintiff's substance and alcohol abuse from her severe co-occurring mental disorders and offers no guidance as to whether plaintiff would be able to work in the absence of substance abuse.

### 3. Carol Greening's Opinion

The ALJ gave partial weight to the opinion of psychiatric nurse practitioner Carol Greening, who treated with plaintiff extensively over a period from October 2015 through March 2017, when the medical evidence of record ends. As a nurse practitioner, Carol Greening is not an acceptable medical source under the regulations, but she is an "other" medical source. 20 C.F.R. s§§ 404.1513(1), 416.913(a). "Other sources" cannot establish the existence of a medically determinable impairment, SSR 06-03P, 2006 WL 2329939, but "information from such other sources, may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Id.; 20 C.F.R. § 416.913(d); Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007) (discussing SSR 06-3p). Here, Nurse Greening's opinion is not offered to establish a medically determinable impairment. Rather, she treated plaintiff for an extended period of time and as a result has special knowledge of plaintiff and insight into her impairments and how they affect her ability to function.

The ALJ rejected Nurse Greening's findings that plaintiff has more bad days than good days, would be off task more than twenty-five percent of the time, and would be absent from work for more than four days per month as inconsistent with the actual mental status exams reflected in Nurse Greening's treatment notes. R. 23. Instead, the ALJ concluded that when abstinent from drugs and alcohol, plaintiff "routinely is psychologically stable with no impairment in thought processes, memory, decisionmaking, and attitude in particular." Id. The

treatment notes cited by the ALJ indicate more impairment than the ALJ identifies in the Decision, however, and he does not acknowledge their negative aspects as are discussed below.

"An ALJ is not required to explain all the evidence in the record. Simply because a matter is not referenced in the opinion does not mean the ALJ failed to rely on the evidence in making his determination. However, this does not give an ALJ the opportunity to pick and choose only evidence in the record buttressing his conclusion." Taylor ex rel. McKinnies v. Barnhart, 333 F.Supp.2d 846, 856 (E.D. Mo. 2004) (internal citations omitted) (citing Robinson v. Barnhart, 366 F.3d 1078, 1083 (10th Cir. 2004) ("The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability."); and Switzer v. Heckler, 742 F.2d 382, 385–86 (7th Cir. 1984) ("[T]he Secretary's attempt to use only the portions [of a report] favorable to her position, while ignoring other parts, is improper.")). Further, the notes are not substantial evidence of whether plaintiff would no longer be disabled if she stopped substance and alcohol abuse.

### a. *Carol Greening's Treatment Notes*

The ALJ cited to Exhibit 10F, treatment notes from plaintiff's initial mental health screening at the Hannibal Free Clinic on September 14, 2015, signed by Teresa Kendrick, R.N., not Nurse Greening. R. 341. The screening followed plaintiff's release from a seven-day inpatient stay at Blessing Hospital after her suicide attempt, with intensive psychiatric treatment consisting of medications (Celexa, Gabapentin, Hydroxyzine P, and Trazodone) and talk therapy in a highly structured treatment environment. R. 240-42. Although plaintiff self-reported that her moods were "much more stable," R. 341, she scored "very high" on the Patient Health Questionnaire (PHQ-9) given at the screening, which indicated severe depression. R. 385. Nurse Nelson's notes state plaintiff reported frequent feelings of hopelessness, worthlessness,

and loneliness, difficulty with memory, concentration, and the ability to make decisions, and plaintiff reported feeling she would be better off dead or of hurting herself nearly every day. R. 341.

Significantly, the fact that plaintiff was feeling "more stable" immediately after intensive inpatient psychiatric treatment following a suicide attempt is not substantial evidence to support the ALJ's rejection of Greening's opinion. As stated above, SSR 13-2p mandates special care when evaluating improvement after mental health and/or substance abuse treatment in facilities such as Blessing Hospital, stating "[i]mprovement in a co-occurring mental disorder in a highly structured treatment setting, such as a hospital or substance abuse rehabilitation center, may be due at least in part to treatment for the co-occurring mental disorder, not (or not entirely) the cessation of substance use[.]" SSR 13-2p, 2013 WL 621536, at *12-13. The ALJ's Decision does not indicate he used the required special care in this evaluation. There is no evidence plaintiff's improvement was due to the cessation of substance and alcohol use, as opposed to intensive treatment for her co-occurring mental disorders.

The ALJ also cited Exhibit 14F, pages 15-18 (R. 369-72), treatment notes of medication evaluations on December 2, 2015, January 6, 2016, and February 17, 2016, as inconsistent with Greening's opinion.[11] As detailed above at Section V, Relevant Medical Evidence, these notes describe plaintiff's ongoing conditions of severe depression, panic disorder, and anxiety, with improvements in and worsening of her conditions from week to week. The treatment notes were not consistently positive, and the ALJ impermissibly picked and chose the portions favorable to a

---

[11]The ALJ's citation to these records fails to recognize they were out of order in the Administrative Record. The December 2, 2015 two-page evaluation is found at R. 369 and 374, and the January 6, 2016 two-page evaluation is found at R. 373, 370. Thus, the ALJ did not consider the entire records of these two visits, and likely erroneously considered the first page of the December 2, 2015 evaluation together with the second page of the January 6, 2016 evaluation.

43

finding of nondisability. The ALJ failed to adequately weigh Greening's observations that plaintiff was depressed, had renewed self-harm behavior (cutting) related to her borderline personality disorder, and that her diagnoses of major depressive disorder and panic disorder were "improving," not stable.

At the December 2, 2015 evaluation, plaintiff reported feeling more depressed after a medication change, her medication was changed again, and plaintiff had started cutting herself again for the first time since August 2015. R. 369. Plaintiff's mood was mildly depressed, her PHQ-9 score was 20, moderate severe depression, and she had thoughts she would be better off dead or of hurting herself nearly every day. R. 384. At the January 6, 2016 evaluation, plaintiff reported her mood was "fairly good" but she had been cutting more, and she reported "no friends" and little socialization. R. 373. She had no severe mood swings but occasional panic attacks. Her anxiety level was mild to moderate most days. Id. Greening stated plaintiff's mood was depressed, her psychiatric condition was stable, her major depressive disorder and panic disorder were improving, but cutting was noted as to plaintiff's borderline personality disorder. R. 370. Plaintiff's GAF was assessed at 50, which is the highest score in the range indicating serious symptoms. DSM-IV at 32-354.[12]   R. 386. At the February 17, 2016 evaluation, Greening noted plaintiff's mood was mildly anxious but plaintiff had taken Trazodone which reduced her anxiety. R. 371. Plaintiff's psychiatric condition was stable and her major depressive disorder and panic disorder were improving. R. 372. Greening noted plaintiff's stress had increased because her children's father had been arrested the previous weekend for drug possession. Id. Plaintiff was to continue her medication and therapy and coping strategy was discussed. Id.

_____

[12]The Court notes that of the numerous GAF scores in the record, the ALJ cites only this one. Most other GAF scores in the record were significantly lower, usually in the 30 to 40 range.

The ALJ's reliance on treatment notes finding plaintiff was consistently "psychologically stable" (sic) is not substantial evidence sufficient to warrant his discounting of Greening's opinion. The ALJ appears to erroneously interpret Greening's finding that plaintiff's psychiatric condition was stable to mean she had no severe mental impairment symptoms, i.e., that her condition was "normal." Instead, this finding indicates that plaintiff was not in an unstable, i.e., an emergency or at-risk, psychiatric condition. See, e.g., R. 240, 273.

Similarly, citing to Exhibit 18F, pages 15-18 (R. 417-20), the ALJ discussed two from a series of plaintiff's medical evaluation visits at the Hannibal Free Clinic. At the August 3, 2016 visit, Nurse Greening evaluated plaintiff's mood as fairly stable following a change in medications, with no panic attacks and mild anxiety, a stable psychiatric condition, and improving depression, panic disorder, and substance use disorders, but she ordered an increase in plaintiff's Rexulti dosage. R. 420. In contrast, at plaintiff's previous visit on July 13, 2016, plaintiff reported her anxiety was "always bad" and scored 15 on the PHQ-9, moderately severe depression. R. 407. At that visit, Nurse Greening noted plaintiff's mood was anxious and mildly depressed, R. 422, and added Rexulti to plaintiff's medications to assist with mood stabilization. R. 423. At the September 7, 2016 visit, plaintiff stated she still gets anxious around a lot of people but had no recent panic attacks, and for the only time in the record stated she had been considering school and "study to get driver's permit."[13] R. 417. Greening noted plaintiff's mood was fairly stable and her depression and panic disorder were improving. R. 418.

The ALJ also cites treatment notes from December 21, 2016 and January 18, 2017, while plaintiff was pregnant (Ex. 23F, R. 489-90), as inconsistent with Greening's opinion. On

---

[13]At the Administrative Hearing, plaintiff testified she never got a driver's permit and there is no evidence of additional study or school. The single reference to driving and school goals at the September 7, 2016 evaluation contrasts with substantial evidence in the record the ALJ fails to acknowledge, such as a March 3, 2017 treatment note at Clarity Healthcare that plaintiff had "no plans for next steps in her life, no effort." R. 523.

December 21, 2016, plaintiff saw Greening for a medication evaluation one week after she was released from an eight-day intensive inpatient psychiatric treatment program at SSM St. Mary's in Jefferson City, following her visit to the emergency room with suicidal ideation in connection with her unplanned pregnancy. R. 489. Plaintiff was mildly depressed and had mild anxiety but did not report any further suicidal ideation. Id. Plaintiff's psychiatric condition was stable and her mood was stabilizing. Id. As discussed above, SSR 13-2p mandates special care when evaluating improvement after mental health and/or substance abuse treatment in facilities like St. Mary's. As with the treatment note of September 14, 2015, the ALJ's Decision does not indicate he used the required special care in evaluating plaintiff's improvement immediately following inpatient psychiatric treatment. There is no evidence plaintiff's improvement was due to the cessation of substance and alcohol use, as opposed to intensive treatment for her co-occurring mental disorders.[14]

At the January 18, 2017 medication evaluation visit, a little over thirty days after plaintiff was discharged from St. Mary's, she was coping fairly well and reported occasional thoughts of suicide but no plans or attempts. R. 487. Plaintiff and Nurse Greening discussed coping strategies. Plaintiff's medication efficacy was fair and her mood was depressed. Id. Greening's notes do not indicate plaintiff's psychiatric condition but state that her major depressive disorder and panic disorder were "improving." R. 490. However, Greening increased plaintiff's dosage of Prozac to 40 mg per day because of increasing symptoms of depression. Id., R. 505.

---

[14]The ALJ also concluded that plaintiff was "psychiatrically stable" in the absence of substance and alcohol use because she "has only one hospitalization for suicidal ideation when abstinent from substance abuse, and this instance is associated with an unwanted pregnancy and temporary cessation of psychotropic medication." R. 20. This is an improper medical conclusion based on speculation and the ALJ's lay interpretation of the record. It also is factually incorrect, as the record shows plaintiff was admitted psychiatrically to Blessing Hospital on October 10, 2014 with suicidal ideation but she had not been using substances at the time. R. 250, 257. Plaintiff also had not been taking her psychotropic medications on that occasion. R. 250. Plaintiff also had not been using illegal drugs when she was admitted to Blessing Hospital on August 6, 2015, following a suicide attempt. R. 314, 322.

Finally, the ALJ cites Exhibit 25F, pages 9-10 (R. 505-06), consisting of two pages of a four-page medication management visit record with Greening on February 8, 2017, which was part of a thirty-eight-page record from Clarity Healthcare. At this visit plaintiff reported experiencing daily thoughts of wanting to die. R. 505. Plaintiff reported her anxiety was mild most days but she was having occasional panic attacks. Id. On mental status exam, plaintiff was depressed, R. 506, and her diagnoses were severe major depressive disorder, recurrent severe without psychotic features; moderate symptomatic panic disorder; moderate asymptomatic amphetamine-type substance disorder; and mild chronic borderline personality disorder. R. 507. Plaintiff was to continue with weekly therapy, R. 508, and her mood was moderately depressed with occasional suicidal ideation. Id.

As stated previously, the majority of these treatment notes are based on plaintiff's denials of drug use and admission of only social alcohol use, though she later admitted continuing to use drugs and alcohol until October 2016. As a result, the treatment notes are not evidence as to whether plaintiff would still be disabled if she quit using drugs and alcohol. Further, although plaintiff was not using substances or alcohol at the time of the January 18, 2017 and February 8, 2017 visits, these records are not substantial evidence that plaintiff's mental impairments would not be disabling in the absence of substance and alcohol abuse because they took place shortly after intensive, highly structured inpatient psychiatric treatment.

In addition, although the record shows plaintiff appeared to be making some progress in late 2016 and early 2017 with regular psychotherapy and consistent medication, the instability of mental impairments and their waxing and waning nature after manifestation must be recognized. Lillard v. Berryhill, 376 F.Supp.3d 963, 984 (E.D. Mo. 2019) (citing, among other cases, Jones v. Chater, 65 F.3d 102, 103 (8th Cir. 1995)). "Although the mere existence of symptom-free

periods may negate a finding of disability when a physical ailment is alleged, symptom-free intervals do not necessarily compel such a finding when a mental disorder is the basis of a claim." Andler v. Chater, 100 F.3d 1389, 1393 (8th Cir. 1996). See also Garrison v. Colvin, 759 F.3d 995, 1017 (9th Cir. 2014) ("Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working."). Here, the ALJ's selective review of the record for positive notations does not consider the possibly waxing and waning nature of plaintiff's mental illnesses.

For these reasons, the Court finds the ALJ should have given significantly more weight to Greening's opinion, particularly as she was the only medical source who treated plaintiff, saw her regularly, and whose opinion includes the period after late 2015 through March 2017.

### b. Activities of Daily Living

In discounting Nurse Greening's opinion, the ALJ also failed to consider the extent to which plaintiff's symptoms may have been controlled or attenuated by the support she received and/or the structure of her daily life. This failure is contrary to the Regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(D); Lillard, 376 F.Supp.3d at 984 (citing Freeman v. Colvin, 2016 WL 4620706, at *5 (W.D. Mo. Sept. 6, 2016); Lonidier v. Colvin, 2014 WL 2864771, at *19 (E.D. Mo. June 24, 2014)).

The ALJ failed to adequately consider the structure within which plaintiff functions in her adult life.[15] Plaintiff is twenty-nine years old and has lived with her grandparents since December 2014. She often isolates to her room. The ALJ stated plaintiff's grandmother reports

---

[15]Notably, even though plaintiff appeared to be making some progress in later 2016 and early 2017 with regularly psychotherapy and medication, the structure in her life did not diminish.

that plaintiff "cleans her home, shops in stores for needed items, and socializes on the phone and in person," R. 24, but substantial evidence in the record shows that, as an adult, plaintiff is unable to drive, seldom goes outside of her grandparents' house into the community, and when she does go she cannot go alone because of her anxiety. R. 199. As for shopping, plaintiff goes to stores once a week for a half hour in the company of another person. Id. Plaintiff's grandmother stated that plaintiff cleans for one hour every four days but has to be told to do it. R. 198. Plaintiff does not cook or know how to cook. R. 350. Plaintiff's activities of daily living consist largely of reading and watching television, R. 196, which the ALJ points to as evidence that she has no impairment in attention or concentration, R. 20, though there is substantial evidence to the contrary in the medical records. The ALJ found that plaintiff maintains appropriate hygiene and grooming because she usually appears appropriately dressed and groomed at the medical appointments her grandparents drive her to, R. 20, but substantial evidence in the record shows that plaintiff often does not dress during the day and remains in her night clothes, does not bathe every day, and sometimes has to be reminded to bathe. R. 198. The ALJ states generally that plaintiff cares for her children on the weekends, but there is substantial evidence she is never with the children unsupervised, and plaintiff's interaction with the children is limited to bathing them, watching them play, sometimes playing with them, and watching television with them. Plaintiff testified she looks to her children to help improve her mental state, R. 46, and Carol Greening recommended that she seek emotional support from the children. R. 519. Further, the ALJ does not address the substantial evidence in the record that plaintiff cannot manage her finances, R. 292, 347, and is unable to pay bills, handle a savings account, count change, or use a checkbook. R.199.

49

In sum, plaintiff depends on her grandparents for meals, shelter, and support and generally relies on family to solve basic daily living issues. "When individuals with mental illness have their lives structured to minimize stress and reduce their signs and symptoms, they 'may be much more impaired for work than their signs and symptoms would indicate.'" Lillard, 376 F.Supp.3d at 983-84 (quoting Andler, 100 F.3d at 1393). Accordingly, because the ALJ failed to consider the extent to which the structured setting and supporting environment affect plaintiff's ability to function, his determination that plaintiff's level of functioning in daily activities was reason to discount Nurse Greening's opinion is not supported by substantial evidence.

In addition, there is no evidence these daily activities reflect plaintiff's activities and abilities in periods of sobriety, and the ALJ's reliance on them as evidence of plaintiff's functioning without substance or alcohol abuse is misplaced. See McClaflin v. Colvin, 2016 WL 5390908, at *12 (W.D. Okla. Sept. 27, 2016). To the extent the ALJ found that plaintiff can carry out these activities of daily living despite her substance and alcohol abuse, this finding "does not serve as evidence to separate the effects of Plaintiff's mental impairments from the effects of her substance abuse." Elliott v. Astrue, 2008 WL 2783486, at *9 (D. Colo. July 16, 2008).

## VIII. Instructions on Remand

For the reasons stated above, the ALJ's Decision was not supported by substantial evidence. The Court finds that the current record cannot support a disability determination either in favor of or against plaintiff.[16] Thus, a remand to the Commissioner is warranted for further administrative proceedings to revisit the sequential DAA evaluation process from the RFC

---

[16]In the Complaint, plaintiff prays that her claim for disability benefits be allowed or in the alternative for a rehearing. Doc. 1 at 3. In the Brief in Support of Complaint, plaintiff requests that the case be remanded, perhaps recognizing she has not met her burden.

assessment forward, because the record needs to be further developed regarding whether DAA is material to plaintiff's disability. On remand, the ALJ's DAA analysis and review of the evidence, which may include supplemental medical examinations and consultation with a medical expert, is governed by Social Security Ruling 13-2p, which sets forth how a DAA analysis should be conducted in cases involving co-occurring mental disorders, and the Regulations otherwise applicable under the five-step sequential disability evaluation. In addition, plaintiff should be afforded a reasonable opportunity to supplement the medical evidence to address the issues identified herein. Plaintiff should remain cognizant that the ultimate burden of proving continued disability rests with her.

## IX. Conclusion

The decision of the Commissioner is reversed and remanded for further consideration pursuant to 42 U.S.C. § 405(g), sentence 4. Upon remand, the ALJ is directed to develop the record in a manner consistent with the Court's opinion. The Court does not disturb the ALJ's determination that in accordance with the five-step sequential evaluation process plaintiff is disabled when all impairments, including substance and alcohol use, are considered. Because plaintiff first applied for benefits in 2015 and it is now 2019, the Commissioner is urged to begin proceedings without delay and resolve this case as soon as possible.

Accordingly,

**IT IS HEREBY ORDERED** that the relief plaintiff seeks in her complaint is **GRANTED** in part and **DENIED** in part. [Doc. 1]

**IT IS FURTHER ORDERED** that a Judgment of Reversal and Remand will accompany this Memorandum and Order, remanding this case to the Commission of Social Security for further consideration pursuant to 42 U.S.C. § 405(g), sentence 4.

51

**IT IS FURTHER ORDERED** that upon entry of the Judgment, the appeal period will begin which determines the thirty (30) day period in which a timely application for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, may be filed.

Dated this 30th day of September, 2019.

Bonnie L. White

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**